[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11512

_____

D.C. Docket No. 1:10-cv-01799-WCO

WELLONS, INC.,

Plaintiff - Counter Defendant - Appellant,

versus

LEXINGTON INSURANCE COMPANY,

Defendant - Counter Claimant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 16, 2014)

Before PRYOR and MARTIN, Circuit Judges, and GOLD,[*] District Judge.

GOLD, District Judge:

Plaintiff-Appellant Wellons, Inc. ("Wellons") appeals the summary

judgment awarded to Defendant-Appellee Lexington Insurance Company

_____

[*] Honorable Alan Stephen Gold, Senior United States District Judge for the Southern District of Florida, sitting by designation.

("Lexington"). Wellons initiated this action seeking a declaratory judgment that Lexington is estopped from denying coverage under a commercial general liability policy and an umbrella policy for an underlying lawsuit against Wellons. Specifically, Wellons contends Lexington assumed and conducted the defense of the underlying lawsuit without adequately reserving its rights and, therefore, Wellons is estopped from asserting any coverage defenses. The parties filed cross-motions for summary judgment, and the district court granted Lexington's motion and denied Wellons' motion. The district court concluded Lexington was not estopped from asserting coverage defenses under both the commercial general liability and umbrella policies. For the reasons stated herein, we conclude Wellons adequately reserved its rights under the commercial general liability policy and is not estopped from asserting coverage defenses under either the commercial general liability or umbrella policy. We accordingly affirm the judgment of the district court.

## I.    FACTS

Wellons is a privately owned business based in Vancouver, Washington that manufactures and installs capital equipment for the forest product industry. Wellons entered into two contracts with Langboard Industries, Inc. ("Langboard"), a company located in Quitman, Georgia that makes oriented strand board ("OSB") for use in home construction and flooring. In the first contract, the Purchase

2

Agreement dated October 21, 2002, Wellons agreed to design and provide two Dryer Energy Thermal Oxidation systems (collectively the "Energy System") to produce heat energy for the OSB production process. According to Langboard, the Energy System was to accomplish three tasks: (1) provide sufficient heat energy to power the OSB production process; (2) incinerate pollutants generated by the OSB production process; and (3) produce sufficient heat to power a boiler and turbine so that Langboard could serve as a co-generator of electricity to be sold to Georgia Power. The total amount of the Purchase Agreement was $13.7 million.

In the second contract, the Construction Agreement dated October 8, 2003, Wellons agreed to erect and install the Energy System. The total amount of the Construction Agreement was approximately $3 million.

Lexington insured Wellons under two insurance policies for the policy period September 1, 2005 to September 1, 2006: (1) a commercial general liability policy, Policy Number 4134867, with a per occurrence limit of liability of $1 million (the "CGL Policy") and (2) an umbrella policy, Policy Number 0880462, with a per occurrence limit of liability of $10 million (the "Umbrella Policy"). The CGL Policy is listed as an underlying policy for the Umbrella Policy. Lexington also insured Wellons under a commercial general liability policy, Policy Number 0453410, for the policy period September 1, 2004 to September 1, 2005 (the "2004 CGL Policy").

3

The CGL Policy provides coverage for "property damage" (a defined term in the Policy), but requires that property damage to be caused by an "occurrence" (also a defined term in the Policy). The Umbrella Policy requires the insured to "immediately notify [Lexington] of any occurrence which may reasonably be expected to result in a claim against this policy" and also to "immediately notify [Lexington] in writing of any claim, along or in combination with any other claims, to which this policy applies which may exceed 25% of the applicable amount set forth in the Schedule of Underlying Insurance."

On November 20, 2004, during the construction phase of the Energy System, a tube bundle collapsed, causing extensive property damage. The Energy System was ultimately placed in service by June 2005.

On September 23, 2005, Wellons, through its insurance agent, provided Lexington a notice of claim under the 2004 CGL Policy regarding the tube bundle collapse. Lexington issued a reservation of rights letter to Wellons on September 30, 2005. The letter stated, "[T]his letter is not to be construed as a waiver of any of the terms, conditions, or provisions of the Lexington Insurance Company policy, or of any right or policy defense now or hereafter available to the Lexington Insurance Company."

Langboard eventually filed suit against Wellons in State Court of Brooks County, Georgia ("*Langboard I*"). Following its receipt of the complaint and

4

summons in *Langboard I*, Lexington, on September 18, 2007, sent Wellons another reservation of rights letter. The letter stated, "There may be additional policy conditions that may also preclude coverage and this should not be construed as a waiver of other terms and conditions that may apply." Lexington engaged counsel to defend Wellons and ultimately paid the 2004 CGL Policy limits to Langboard to resolve *Langboard I*.

In February 2006, after the Energy System had been in operation for some time, leaks developed in the superheater portion of the Energy System. The superheater, an integral part of the Energy System, is a component of the boiler and the last section of the boiler where steam passes before being sent to the turbine. According to Wellons' president, the superheater needed to be functional to demonstrate the full capacity of the Energy System.[1]

Wellons determined that the leaks had developed through expansion and contraction of the header in the superheater, for which adequate physical clearance had not been provided. Wellons hired Hunt Construction ("Hunt") to assist with the modification of the superheater header to enable it to be lifted and the leaks repaired, and to perform the seal welds.

---

[1] When asked about Wellons' position on whether the Energy System was capable of producing sufficient heat, Wellons' president testified, "And we had the superheater that needed to be replaced, you know, to demonstrate the full capacity of the system."

5

After Hunt completed the repairs in early March 2006, testing revealed leaks in a substantial number of the joints that were seal welded. Hunt repaired the leaks and left the job site on March 8, 2006, and Langboard put the superheater back in service. Approximately two weeks later, one of the superheater tubes completely severed. It was Wellons' position that Hunt's faulty repair work caused the tube's severance.

On April 4, 2006, Wellons received a letter from Langboard requesting a new superheater be designed and installed at its Quitman facility because the condition of the current superheater was "not conducive to long term operation." Wellons, understanding the cost would be $850,000, agreed to design and install a new superheater for Langboard. Wellons did not immediately provide Lexington with notice of Langboard's request to replace the superheater.

On August 17, 2006, Wellons, through its agent JBL&K Risk Services (now known as Beecher Carlson) notified Lexington of Langboard's claim for a new superheater (the "August 2006 Notice"), in conjunction with Hunt's filing of a suit on June 16, 2006 against Wellons in the Superior Court of Cobb County, Georgia (the "Hunt Suit") for monies owed on Hunt's contract with Wellons. The August 2006 Notice described the claimant as "Hunt/Langboard," and described the occurrence as "Claimant construction defect. Please contact insured for add'l

6

information." The August 2006 Notice referenced the CGL Policy (Policy Number 4134867) and did not reference the Umbrella Policy.

On March 2, 2007, Lexington informed Wellons through Foltz Martin LLC ("Foltz Martin"), independent counsel retained by Wellons in August 2006 to defend the Hunt Suit and advise Wellons on insurance coverage issues, that the August 2006 Notice had two claims embedded within it: (1) the Hunt Suit for nonpayment of work performed, as to which Lexington denied coverage on March 2, 2007, and (2) Langboard's claim for the replacement of the superheater, which would be addressed in a separate letter.

On March 5, 2007, Lexington issued a preliminary "Reservation of Rights" letter to Wellons. The letter stated the claimant was Langboard and indicated the claim involved "the failure of a Superheater at claimant's Georgia facility." In the introduction of the letter, Lexington stated "there may be a coverage question and we are investigating this matter under a reservation of rights." Lexington then quoted select portions of the CGL Policy, including the portions which require "property damage" caused by an "occurrence." Lexington also referred Wellons to the exclusions for "Damage to Property," "Damage to Your Product," and "Damage to Your Work." Lexington notified Wellons that its agreement to replace the superheater without Lexington's consent may be in violation of the policy terms. Lexington concluded the letter,

7

We are continuing to investigate the coverage on this matter under a reservation of rights and will advise you of our position shortly. There may be additional policy conditions that may also preclude coverage and this should not be construed as a waiver of other terms and conditions that may apply. If there is other information relative to this matter that may affect our coverage determination, you should advise us in writing immediately.

On April 25, 2007, Lexington supplemented its March 2007 letter with another "Reservation of Rights" letter. Lexington advised Wellons it currently had no obligation to defend or indemnify Wellons. With respect to its duty to defend, Lexington stated it "ha[d] no current obligation to defend Wellons in connection with the claims being asserted by Langboard" because no lawsuit had been commenced against Wellons, "and without a suit, the policy does not obligate Lexington to provide a defense." Regarding its duty to indemnify, Lexington explained, "it is unclear exactly what Langboard's claims of injury are, beyond the demand that the superheater be replaced. As a result, at this time, Lexington has no duty to indemnify Wellons …."

Also in the April 2007 letter, Lexington quoted portions of the CGL Policy, including the portions which require "property damage" caused by an "occurrence." As in the March 2007 letter, Lexington referred Wellons to the exclusions for "Damage to Property," "Damage to Your Product," and "Damage to Your Work" and explained why these sections would bar coverage. Lexington also raised the "Expected or Intended Injury" exclusion and the "Exclusion for Failure

8

to Supply" and explained how these provisions could apply to Wellons' claim. Lexington stated, "Without specifics as to what Langboard is claiming as to the cause, how Wellons is responsible (negligent) and what the exact damage is, we can not more specifically address coverage." Lexington further stated it would continue its investigation into the facts and circumstances of the claim and invited Wellons to provide Lexington any additional relevant information. Lexington concluded, "Lexington continues to reserve all of its rights in connection with this claim and failure to set forth any policy provision that may be applicable is not intended to constitute a waiver of any of Lexington's rights to rely on any applicable policy provisions or law."

Langboard's complaints about the superheater component eventually evolved into complaints about the entire Energy System. On May 2, 2007, Langboard emailed the following letter to Wellons, notifying Wellons of concerns with the capacity of the Energy System:

> By way of this letter, Langboard is requesting Wellons to put a hold on the production of the superheater. We do not believe that at this time there is enough available heat from the two Wellon heat sources to run the O.S.B. plant and generate steam to run the turbine. Langboard is looking into the possibility of going to a power resin system that will allow us to run a higher moisture from the dryers which would lighten the load on the Wellons units. If this does not give us more available heat we may decide to move the turbine generator to a more suitable location.

9

Although this May 2, 2007 email was Langboard's first written communication to Wellons regarding the capacity concerns, Langboard had, six months prior, verbally instructed Wellons to put the superheater on hold.

On July 13, 2007, Foltz Martin sent a letter to Lexington's claims adjuster, David Farrell, disagreeing with Lexington's coverage position. The letter set forth Wellons' position that, although the initial leaks in the superheater were arguably caused by a defect in the design of the superheater, it was "Hunt's faulty repair of the connection between the tubes and the header [that] caused structural damage to the remainder of the Superheater, and this is the property damage which Langboard claims."

Foltz Martin's letter also quoted the portions of the CGL Policy requiring "property damage" caused by an "occurrence" and stated, "The damage to the Superheater constitutes property damage. One of the tubes broke in two a few weeks after Langboard resumed operating the Superheater. Many, if not all, of the remaining tubes suffered non-repairable structural damage." The letter continued,

> The property damage was caused by an "occurrence." It resulted from Hunt's negligent welding work at the connection of the tube and the header. Wellons is not seeking coverage for the defective work. Instead, Wellons is seeking coverage for structural damage and total loss of use to the Superheater resulting from Hunt's poor workmanship. Thus, the damage constitutes an occurrence.

Wellons then demanded Lexington indemnify Wellons for the costs to replace the superheater on or before July 28, 2007, and advised, if Lexington failed

10

to do so, "Wellons will construe Lexington's continued failure to intervene on its behalf as a denial of coverage and breach of its duty to indemnify under the policy."

Although Foltz Martin's July 2007 letter did not explicitly mention Langboard's concern with the capacity of the Energy System, it is undisputed that Lexington knew of the capacity claim before Langboard filed suit on the claim. It is also undisputed that, even before Langboard filed suit, Lexington's coverage position assessed not only Langboard's issues with the superheater, but also Langboard's "ongoing claim" that the Energy System's "production and cogeneration … had never reached the levels they should have."

On October 31, 2007, Langboard filed suit against Wellons in the Superior Court of Brooks County, Georgia ("*Langboard II*"). The *Langboard II* complaint alleged generally that the Energy System designed and installed by Wellons never worked as expected. Specifically, the Energy System was never able to meet the emissions requirements or produce enough heat to simultaneously run the co-generator. Langboard further contended that Wellons' improper installation of the superheaters caused leaks to develop and that Wellons' attempts to repair the leaks were inadequate. Langboard sought as damages the repair or replacement of the Energy System. Langboard also sought compensatory damages for breach of the

11

Purchase Agreement and Construction Agreement, as well as attorneys' fees and costs.[2]

On November 16, 2007, Wellons, through Beecher Carlson, notified Lexington of *Langboard II* by emailing a copy of the summons and complaint directly to David Farrell, the claims adjuster previously assigned to Langboard's claim for a new superheater. Neither Wellons nor Beecher Carlson submitted a new claim form.

On November 27, 2007, Beecher Carlson contacted Farrell to inquire as to the status of the complaint and the name of the law firm assigned to handle it. Lexington responded by email to Susan Towne of Beecher Carlson on November 28, 2007, stating it initially appeared there was no coverage, "but upon reviewing again there is some question that we may have some limited coverage. I have asked coverage counsel who was involved in the other related suits to take a quick look to see if he concurs with our thoughts. Should have an answer within the next few days."

On November 29, 2007, Farrell spoke with Towne and told her Lexington was going to defend *Langboard II* under a reservation of rights.[3] Although he did

---

[2] Although the *Langboard II* complaint did not specify the amount of damages sought, the total amount of the Purchase Agreement was $13.7 million and the total amount of the Construction Agreement was approximately $3 million. Additionally, the cost to replace the superheater, a component of the Energy System, was $850,000.

not orally specify particular coverage defenses, he stated Lexington's prior reservation of rights letters were "in the same mode" and "the issues addressed in each of the letters are still applicable."[4] Shortly after getting off the phone with Farrell, Towne entered in Beecher Carlson's business records, "David/adj has agreed to provide defense under and [sic] ROR. Will use the same attorney and same claim. Will forward to the atty to prepare an answer." Towne then sent an email to Brad Miller, also of Beecher Carlson, stating, "David agreed to provide a defense on a ROR."

Subsequently, Lexington retained Hall Booth Smith & Slover, P.C. ("Hall Booth") to defend Wellons in *Langboard II*. Hall Booth was already defending Wellons in *Langboard I*. Foltz Martin appeared in *Langboard II* as Wellons' co-counsel of record along with Hall Booth, and Foltz Martin and Hall Booth jointly defended the lawsuit at trial.

---

[3] Under Georgia law, independent insurance agents of brokers are generally considered the agent of the insured. Kay-Lex Co. v. Essex Ins. Co., 649 S.E.2d 602, 607 (Ga. Ct. App. 2007). According to general agency principles, "Notice to the agent of any matter connected with his agency shall be notice to the principal." Witcher v. JSD Props., 690 S.E.2d 855, 857 (Ga. 2010) (citation omitted). Wellons does not dispute Beecher Carlson's agency relationship, nor does Wellons argue on appeal that communications with Beecher Carlson do not constitute communications with Wellons.

[4] Although Towne testified she did not have an independent recollection of her conversation with Farrell (other than that Lexington would provide a defense under a reservation of rights), she did not disagree with Farrell's recollection. On summary judgment, Towne's inability to independently recall the conversation does not create a genuine issue of fact.

On February 25, 2009, Brad Miller of Beecher Carlson sent Farrell a letter inquiring as to whether the CGL and Umbrella Policies would be available to satisfy the claims in *Langboard II*. The letter characterized *Langboard II* as involving "Langboard's claim that the energy system fails to provide sufficient energy to generate electricity. Specifically, the second lawsuit includes allegations of faulty repair work performed in February of 2006 by … Hunt … and an alleged failure of the superheater section of the boiler in March of 2006."

On March 20, 2009, Miller sent an email stating,

> I got a voicemail just today from David advising a letter is coming but that their position is still one occurrence for the falling over of the bundles and the other items are not considered a covered occurrence. I have not spoken with him but a letter is forthcoming and we can catch up at that time on this issue.

A few days letter, on March 23, 2009, in an e-mail sent to Miller, Kevin Hudson of Foltz Martin observed, Lexington "is argu[ing] it is excused from both cases because it contends both cases arise from 1 occurrence."

In an email dated June 26, 2009 and letter dated July 1, 2009, Bryan Baer of Foltz Martin wrote to Farrell and pointed out Farrell had not yet responded to the question posed in the February 25, 2009 letter regarding coverage under the CGL and Umbrella Policies. The July 1, 2009 letter also stated, with respect to *Langboard II*,

> Langboard contends that the energy systems Wellons provided fail to produce sufficient energy to enable Langboard to produce any

14

meaningful levels of electricity. This contention has nothing to do with the collapse of the heat exchanger, but instead arises out of Hunt's faulty work on the superheater in March of 2006.

On December 22, 2009, Baer wrote Farrell a letter stating, were *Langboard I* to settle with Lexington contributing $1,000,000 toward the settlement, "it is our understanding that Lexington will continue to defend Wellons in the second suit [*Langboard II*]." The letter stated the "first case … involves a collapse of a Heat Exchanger" and the "second case … involves Langboard's claim that the energy system fails to provide sufficient energy to generate electricity and arises from the negligent repair of the superheater by Wellons' subcontractor, Hunt Construction, in March of 2006."

On March 12, 2010, Lexington emailed a letter to Baer denying coverage for the *Langboard II* claims under the CGL Policy. Lexington noted that discovery and depositions had been completed, and the facts developed during discovery did not meet the definition of either "occurrence" or "property damage" under the CGL Policy. Rather, discovery showed "that the superheaters never operated as expected and the only damages are for less production of OSB than expected as well as lack of energy for cogeneration purposes." Lexington referenced its September 30, 2005 and March 5, 2007 reservation of rights letters and noted that certain exclusions referenced in those letters may otherwise be applicable if there were an "occurrence" or "property damage." Although Lexington denied coverage, it

continued the defense of Wellons in the *Langboard II* trial, "as … previously advised."

On March 15, 2010, *Langboard II* was tried to a jury. The jury awarded Langboard $8,440,764, consisting of $3,425,000 for breach of the Purchase Agreement and $5,015,764 for breach of the Construction Agreement. Judgment was entered on the verdict on March 31, 2010. Wellons appealed the verdict to the Georgia Court of Appeals.

Around the time of the verdict, although Wellons never provided a formal notice of claim under the Umbrella Policy, Lexington referred the *Langboard II* claims to its excess claim unit. On April 22, 2010, Lexington first asserted its coverage position under the Umbrella Policy, denying coverage.

On June 11, 2010, Wellons filed a declaratory judgment action. Wellons does not contend that the verdict is a covered loss under the CGL Policy or the Umbrella Policy. Rather, Wellons requests a declaration that Lexington is required to indemnify Wellons for the jury verdict entered in *Langboard II* because Lexington did not adequately reserve its rights and is estopped from asserting its coverage defenses under either Policy.

On the parties' cross-motions for summary judgment, the district court concluded Lexington was not estopped from denying coverage under the CGL

Policy or Umbrella Policy and entered judgment accordingly. Wellons filed this appeal from the final summary judgment.

## II.    STANDARD OF REVIEW

Our review of a summary judgment order is plenary, and we apply the same legal standards as those used by the district court. Lindley v. F.D.I.C., 733 F.3d 1043, 1050 (11th Cir. 2013). "Summary judgment is appropriate when there is no genuine issue of material fact and the evidence compels judgment as a matter of law in favor of the moving party." Fed. R. Civ. P. 56(a). The interpretation of an insurance contract is also a matter of law subject to *de novo* review. Chalfonte Condo. Apartment Ass'n Inc. v. QBE Ins. Corp., 561 F.3d 1267, 1274 (11th Cir. 2009).

## III.    DISCUSSION

In this diversity action, the federal courts must apply the substantive law of the forum state, Georgia. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); Horowitch v. Diamond Aircraft Indus., Inc., 645 F.3d 1254, 1257 (11th Cir. 2011). Under Georgia law, "risks not covered by the terms of an insurance policy, or risks excluded therefrom, while normally not subject to the doctrine of … estoppel, may be subject to the doctrine where the insurer, without reserving its rights, assumes the defense of an action or continues such defense with knowledge, actual or constructive, of noncoverage." World Harvest Church,

Inc. v. GuideOne Mut. Ins. Co., 695 S.E.2d 6, 9 (Ga. 2010) (quoting Prescott's Altama Datsun v. Monarch Ins. Co. of Ohio, 319 S.E.2d 445 (Ga. 1984)). "The insurer can avoid estoppel by giving timely notice of its reservation of rights which fairly informs the insured of the insurer's position." World Harvest, 695 S.E.2d at 9 (quoting State Farm Fire and Cas. Co. v. Walnut Ave. Partners, 675 S.E.2d 534 (Ga. Ct. App. 2009)). The purpose of a reservation of rights is "to protect both the insurer and the insured by allowing an insurer who is uncertain of its obligations under the policy to undertake a defense while reserving its rights to ultimately deny coverage following its investigation …." Hoover v. Maxum Indem. Co., 730 S.E.2d 413, 417 (Ga. 2012); see also Ponse v. Atlanta Cas. Co., 563 S.E.2d 499, 501 (Ga. Ct. App. 2002) (insurer has "a right to investigate" whether it has a duty to defend and indemnify).

The Georgia Supreme Court's recent World Harvest decision made clear that a reservation of rights need not be in writing to avoid estoppel. 695 S.E.2d at 9. The reservation itself must be unambiguous: "At a minimum, the reservation of rights must fairly inform 'the insured that, notwithstanding the insurer's defense of the action, it disclaims liability and does not waive the defenses available to it against the insured.'" Id. at 10 (quoting State Farm Mut. Auto Ins. Co. v. Anderson, 123 S.E.2d 191 (Ga. Ct. App.1961)) (alterations omitted). "The reservation of rights should also inform the insured of the specific 'basis for the

18

insurer's reservations about coverage.'" Id. (quoting Jacore Sys. Inc. v. Central Mut. Ins. Co., 390 S.E.2d 876, 878 (Ga. Ct. App. 1990)) (alterations omitted).

At the heart of this appeal is the specificity required by Georgia law for an effective reservation of rights. Wellons argues the Georgia Supreme Court's recent decisions in World Harvest and Hoover require the insurer to inform the insured of the specific basis for the reservation. Lexington contends World Harvest and Hoover do not require such specificity, but rather require only that the reservation of rights fairly inform the insured that, notwithstanding the insured's defense of the action, it disclaims liability and does not waive its coverage defenses. We conclude a reservation of rights need not specify each and every potential basis for contesting coverage, as long as the reservation fairly informs the insured that, notwithstanding the defense of the insured, the insurer does not waive its coverage defenses.

We note first that, while the World Harvest court states an insurer "must" fairly inform the insured that the insurer is providing a defense under a reservation of rights, it states only that an insurer "should" inform the insured of the specific basis for the insurer's reservation of coverage. Id. at 10. We thus read World Harvest, on its face, to *require* the insured to fairly inform the insured that it is defending under a reservation of rights, but to only *recommend* that the insurer provide the specific basis for the reservation.

19

Further, we recognize that, while the World Harvest states a reservation of rights "should" inform the insured of the "specific basis for the insurer's reservations about coverage." 695 S.E.2d at 10, the Georgia Supreme Court does not provide the parameters of this specificity. The opinion, however, cites and relies on long-standing Georgia law which supports our conclusion that an effective reservation of rights need not specify every potential basis for the reservation.

In World Harvest, the Georgia Supreme Court specifically relied on Georgia Court of Appeals decisions in Anderson, 123 S.E.2d 191 (Ga. Ct. App.1961) and Walnut Avenue 675 S.E.2d 534 (Ga. Ct. App. 2009). In Anderson, the Georgia Court of Appeals held the insurer's notification to the insured that any defense undertaken by the insurer "shall not be construed as a waiver of the right to deny liability at any time" was effective despite its lack of specificity. 123 S.E.2d at 193. The court held the reservation "was broad enough to cover denial of liability on the ground the policy was void." Id.

Similarly, in Walnut Avenue, a non-waiver agreement stated the defense of any claim "shall not waive any right [the insurer] may have to deny any obligation under the policy contract, and shall not waive any rights of the undersigned." 675 S.E.2d at 539. The Georgia Court of Appeals held this language permitted the insurer to raise the coverage defense of untimely notice, even though that defense

20

was not specified in the reservation of rights. Id. at 539-40. In short, Anderson and Walnut Avenue provide that broad reservation of rights language is sufficient to protect an insurer from coverage by estoppel. We do not read World Harvest's recommendation on specificity, see 695 S.E.2d at 10 (insurer "should" inform the insured of the specific basis for the reservation), to overrule the very Georgia authority on which the decision relies.

Other Georgia authority supports our reading of World Harvest. The Georgia Court of Appeals has repeatedly held that an insurer "is not required to list each and every basis for contesting coverage" in the reservation of rights letter. Kay-Lex Co. v. Essex Ins. Co., 649 S.E.2d 602, 608 (Ga. Ct. App. 2007) (citation omitted); N. Metro Directories Publ'g, LLC v. Cotton States Mut. Ins. Co., 631 S.E.2d 726 (Ga. Ct. App. 2006) (same); see also Provau v. State Farm Mut. Auto. Ins. Co., 772 F.2d 817, 820 (11th Cir. 1985) (per curiam) (where state supreme court has not addressed an issue, federal court sitting in diversity is "bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise"). One reason is that the insurer may not know of certain coverage defenses until discovery has been completed and the insurer has completed its investigation. See Gov't Emps. Ins. Co. v. Progressive Cas. Ins. Co., 622 S.E.2d 92, 96 (Ga. Ct. App. 2005) (reservation of rights letter need not list every basis for contesting coverage

21

because insurer may learn of other grounds during discovery); cf. Hoover, 730 S.E.2d at 417 (purpose of reservation of rights is, in part, to allow insurer to investigate).

Finally, we conclude, based on Georgia authority explicitly relied upon in World Harvest, that the consent of an insured to an insurer's reservation of rights, including the terms of the reservation, "may be express or implied [from] the insured's tacit acquiescence in the insurer's unilateral reservation of right[s]; e.g., when the insured, after receiving notice, permits the insurer to continue the defense of the suit." Anderson, 123 S.E.2d at 193; see also Walnut Avenue, 675 S.E.2d at 540 ("Georgia law … recognizes that an insurer can reserve its rights unilaterally or with the implied consent of the insured."); Jacore, 390 S.E.2d at 878 ("By not objecting to the reservation of rights letter and by permitting appellee to go forward with its defense of the suit, appellant is deemed to have consented to the letter's terms.").

Having set forth our interpretation of Georgia law, we turn to the case before us. We conclude, based on the undisputed evidence of record, that Lexington's reservation of rights was adequate under Georgia law, and Lexington is not estopped from asserting coverage defenses under the CGL Policy. Less than two weeks following the receipt of the summons and complaint in *Langboard II*, on November 29, 2007, Lexington, through its adjuster David Farrell, orally notified

22

Wellons' insurance agent that Lexington would provide a defense for *Langboard II* under a reservation of rights. Farrell referred the agent to Lexington's prior reservation of rights letters and informed her that the issues addressed in those letters were still applicable. It is undisputed that Wellons' agent clearly understood Lexington's defense of *Langboard II* was under a reservation of rights: she sent an email acknowledging the defense was on a reservation of rights and also entered an internal business record that the defense was on a reservation of rights. Based on this evidence, we conclude Lexington's oral reservation of rights was timely and unambiguous.

In addition, Farrell's reference to Lexington's previous reservation of rights letters satisfied the requirements for an effective reservation of rights. Both the March 5, 2007 and April 25, 2007 letters identified specific policy provisions that may bar coverage. While the April 2007 letter quoted large portions of the policy, it also provided detailed analysis as to why specific provisions and exclusions may apply. Lexington's April 2007 letter is thus a far cry from an insurer cutting and pasting the entire insurance policy into a letter, with no explanation or analysis.

We also note that both the March 2007 and April 2007 letters quoted the CGL Policy requirement that "property damage" be caused by an "occurrence" (the basis upon which Lexington ultimately denied coverage). While the letters themselves did not contain an explanation as to how this requirement applied to

23

Langboard's claims, the undisputed evidence shows that, by the time *Langboard II* was filed, the Policy's requirement that "property damage" be caused by an "occurrence" was a central point of the ongoing coverage discussions between Wellons and Lexington. On July 13, 2007, Wellons' coverage counsel sent Lexington a letter explaining in detail Wellons' position that the structural damage to the superheater constituted "property damage" and Hunt's negligent welding work at the connection of the tube and header, which resulted in total loss of use of the superheater, constituted an "occurrence." Therefore, by the time *Langboard II* was filed, Wellons knew failure to show "property damage" caused by an "occurrence" was a potential coverage defense.

Most importantly, though, Lexington's March 2007 and April 2007 letters both contained nonwaiver clauses that specifically reserved Lexington's right to assert additional coverage defenses.[5] By permitting Lexington to go forward with Wellons' defense in *Langboard II* with no objection, Wellons implicitly consented not only to a defense under a reservation of rights, but also to the terms of the reservation, including the nonwaiver clause contained in the March 2007 and April 2007 letters. Under Georgia law, these nonwaiver clauses were sufficient to protect

---

[5] That Farrell did not specify in his oral reservation which letters he was referencing is of no moment, as all of Lexington's prior reservation of rights letters, including the September 30, 2005 and September 18, 2007 letters, contained nonwaiver clauses.

24

Lexington's rights and avoid estoppel. See, e.g., Walnut Avenue, 675 S.E.2d at 539-40; Anderson, 123 S.E.2d at 193.

Wellons argues the March and April 2007 letters were not proper reservations of rights, and, therefore, Lexington cannot reserve additional defenses through those letters. We disagree with Wellons' position. It is immaterial whether the March and April 2007 letters themselves adequately reserved Lexington's rights under Georgia law. Rather, Lexington's oral and unambiguous reservation of rights in November 2007, coupled with the nonwaiver clauses in the March and April 2007 letters, satisfied Georgia law as to a reservation on *Langboard II*.

Wellons further argues that the March and April 2007 letters did not relate to *Langboard II* and, consequently, cannot form the basis of the reservation for *Langboard II*. More specifically, Wellons contends the March and April 2007 letters involved issues with the superheater component, whereas *Langboard II* concerned the capacity of the entire Energy System. Wellons' argument is misplaced: the undisputed facts indicate that the superheater and capacity issues were not as discrete as Wellons suggests.[6]

The superheater is a functionally indispensable part of the Energy System's ability to generate capacity. Indeed, Wellons' president testified at his deposition

---

[6] Although Wellons argues in this suit that the superheater and capacity claims were discrete issues, in their February 2009, July 2009, and December 2009 letters to Lexington, Wellons' insurance agent and independent coverage counsel characterized the capacity claim as arising out of Hunt's negligent work on the superheater.

that, without a functional superheater, the full capacity of the Energy System could not be reached. With this functional dependency in mind, it is no surprise that Langboard's initial claim for a new superheater evolved into a claim that the Energy System had insufficient capacity.

On May 2, 2007, Langboard emailed Wellons its request that Wellons stop production of a new superheater because Langboard did not believe there was enough heat available from the Energy System for the OSB production process. This email was amidst months of discussions between Lexington, on the one hand, and Wellons, its independent coverage counsel Foltz Martin, and its insurance agent, on the other, regarding Lexington's coverage position. It is undisputed that Farrell became aware of Langboard's capacity claim before *Langboard II* was filed, and, before *Langboard II* was filed, Lexington's coverage position assessed not only Langboard's issues with the superheater, but also Langboard's capacity concerns.

Hence, by the time *Langboard II* was filed on October 31, 2007, and well before Farrell's oral reservation of rights on November 29, 2007, both parties were aware that Langboard's claims against Wellons and Lexington's coverage positions under the CGL Policy included not only the superheater claim, but also the capacity claim. While the March 2007 and April 2007 letters may not have specifically referenced Langboard's complaints about the capacity of the Energy

26

System, we conclude, based on the undisputed evidence before us regarding the ongoing communications between Wellons and Lexington, that once *Langboard II* was tendered and Farrell issued an oral reservation of rights, the oral reservation coupled with the letters fairly informed Wellons of Lexington's coverage position as to *Langboard II*.

Wellons next argues, relying on Facility Investments, LP v. Homeland Insurance Co., 741 S.E.2d 228, 233 (Ga. Ct. App. 2013), that even if the nonwaiver clauses are valid, Georgia law does not permit Lexington to omit known coverage defenses. Wellons has not cited any record evidence showing Lexington knew, at any time before its March 2010 denial of coverage, of facts demonstrating there was no "property damage" or "occurrence." See id. at 233. To the contrary, although Farrell recognized that a lack of "property damage" or "occurrence" could theoretically apply to bar coverage, these defenses of noncoverage were not *known* to Lexington until it concluded its investigation into the underlying suit and after the close of discovery, at which time it issued its denial letter.

Finally, we turn to Wellons' reliance on Hoover v. Maxum Indem. Co., 730 S.E.2d 413 (Ga. 2012), in which the Georgia Supreme Court held an insurer cannot both deny a claim outright and attempt to reserve the right to assert a different coverage defense in the future. *Id.* at 416. Hoover is patently distinguishable from the case before us, as Lexington did not both deny Wellons' claim and reserve the

right to assert additional defenses. Rather, Lexington followed the procedure explicitly approved of in <u>Hoover</u>. <u>Id.</u> at 417. Because Lexington was uncertain of its obligations under the CGL Policy, it defended Wellons under a reservation of rights. Following its investigation and based on the facts developed during discovery, Lexington denied Wellons' *Langboard II* claim on March 2010, when it concluded that the *Langboard II* claims did not meet the definition of either "occurrence" or "property damage" under the CGL Policy.

In sum, we conclude Lexington's reservation of rights was adequate under Georgia law, and Lexington was not estopped from asserting coverage defenses under the CGL Policy. Thus, summary judgment in favor of Lexington as to coverage under the CGL Policy was proper. We turn now to coverage under the Umbrella Policy.

As with the CGL Policy, the sole theory under which Wellons seeks relief under the Umbrella Policy is that Wellons defended under the Policy without effectively reserving its rights and is, therefore, estopped from denying coverage. We conclude Lexington is not estopped from asserting coverage defenses under the Umbrella Policy because Wellons failed to provide timely notice of a claim under the Policy and Lexington never defended under the Policy without reserving its rights, as required for coverage by estoppel.

Turning first to the issue of notice, the Umbrella Policy required Wellons to "immediately notify [Lexington] of any occurrence which may reasonably be expected to result in a claim against this policy" and also to "immediately notify [Lexington] in writing of any claim, along or in combination with any other claims, to which this policy applies which may exceed 25% of the applicable amount set forth in the Schedule of Underlying Insurance." As Wellons conceded at oral argument, Wellons never provided Lexington with a formal notice of claim under the Umbrella Policy. Neither the September 30, 2005 nor the August 17, 2006 notices of claim specified the Umbrella Policy number, while these notices did specify the 2004 CGL Policy and CGL Policy numbers, respectively. Additionally, there is no evidence that Wellons' November 16, 2007 tender of *Langboard II* mentioned the Umbrella Policy number.

Wellons does not contest in its briefs that it never provided Lexington with a formal notice of claim under the Umbrella Policy, but suggests in a footnote in its reply brief, as it did at oral argument, that Wellons' mention of the Policy in its February 2009 and subsequent letters to Lexington put Lexington on notice of a claim under the Umbrella Policy. Even if we assume that Wellons' February 2009 mention of the Umbrella Policy constituted notice, we nonetheless conclude this notice was not timely.

29

*Langboard II* was filed in October 2007. The damages requested in *Langboard II*, including replacement of the Energy System, would likely exceed the $1 million limit of the underlying CGL Policy. Indeed, Wellons knew that replacement of the superheater alone would cost $850,000. Wellons also knew the Purchase and Construction Agreements, pursuant to which the Energy System was built and installed, were in the amounts of $13.7 and $3 million, respectively. Wellons' first mention of the Umbrella Policy in correspondence to Lexington was in February 2009. A delay of over one year does not constitute "immediate" notification as required by the Umbrella Policy. Further, Wellons cites no Georgia authority suggesting Lexington had an obligation to presume notice under the Umbrella Policy simply because Lexington was the issuer of both the CGL and Umbrella Policies. Because Wellons did not timely provide Lexington with notice of a claim under the Umbrella Policy, Lexington was under no duty to defend or indemnify Wellons.

Despite having never put Lexington on notice of a claim as required by the Umbrella Policy, Wellons, relying on American Family Life Assurance Co. of Columbus, Georgia v. United States Fire Co., 885 F.2d 826 (11th Cir. 1989), argues Lexington is estopped from denying coverage under the Umbrella Policy. We conclude otherwise.

30

To create coverage by estoppel under Georgia law, an insurer must, without reserving its rights, assume the defense of the action. See, e.g., Prescott's Altama Datsun, 319 S.E.2d at 446. There is no evidence of record on summary judgment that Lexington assumed the defense of *Langboard II* under the Umbrella Policy. Lexington's March 2007 and April 2007 letters explicitly referenced the CGL Policy but did not mention the Umbrella Policy. Lexington's March 2010 denial letter also mentioned only the CGL Policy and not the Umbrella Policy. Wellons has presented no evidence that Lexington paid for the defense of *Langboard II* under the Umbrella Policy. Additionally, Farrell testified that Lexington's defense of *Langboard II* was under the two CGL policies, not the Umbrella Policy, and Wellons did not, on summary judgment, provide any evidence to the contrary. Because Lexington did not provide a defense under the Umbrella Policy, it cannot, under Georgia law, be estopped from denying coverage under the Policy. See id. at 446.

American Family, the case on which Wellons predominantly relies, is wholly distinguishable from this case and does not alter our conclusion that Lexington is not estopped from denying coverage. Unlike Wellons, the insured in American Family gave notice to its excess insurer. Moreover, American Family did not concern coverage by estoppel. Rather, after the excess insurer denied both defense and coverage, the Court held the excess carrier had a contractual obligation

31

to provide a defense. 885 F.2d at 832. Nowhere in American Family did the parties raise, or did this Court discuss, coverage by estoppel.[7]

In summary, Lexington is not estopped from asserting coverage defenses under either the CGL Policy or the Umbrella Policy. Lexington adequately reserved its rights before defending Wellons under the CGL Policy. Lexington was not obligated to defend Wellons under the Umbrella Policy because Wellons did not provide notice of a claim as required by the terms of the Policy. Additionally, Lexington did not defend Wellons under the Umbrella Policy, thereby barring a finding of coverage by estoppel under that Policy. We conclude summary judgment in favor of Lexington was proper.

AFFIRMED.

---

[7] Because we conclude Wellons did not provide notice, as required for coverage under the Umbrella Policy, and Lexington did not undertake a defense under the Umbrella Policy, as required for coverage by estoppel, we need not reach whether American Family imposes an extra-contractual duty to defend under an excess policy. 885 F.2d at 832 ("U.S. Fire became obligated to defend once it became clear that Boston Old Colony's policy would not cover American Family's liability."). If we did reach this argument, though, we would conclude the language is dicta and does not constitute the holding of the case. The American Family Court's finding of a duty to defend was clearly pursuant to the terms of that particular excess policy, id. ("It is true in that in the absence of a *contractual obligation* U.S. Fire the excess insurance carrier was not obligated to provide a defense."; "Because U.S. Fire was *contractually* obligated to provide a defense …." (emphasis added)), and any statement as to an extra-contractual duty is dicta.